IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON


JAMES ALLEN HARPER, a resident
and citizen of Ohio previously
doing business as Southern Ohio
Disposal, and
SOUTHERN OHIO DISPOSAL LLC, an
Ohio limited liability company,

       Plaintiffs,

v.                           Case No. 2:03-cv-00516

PUBLIC SERVICE COMMISSION OF
WEST VIRGINIA, JON W. McKINNEY,[1]
in his official capacity as Chairman
of the Public Service Commission of
West Virginia; EDWARD H. STAATS,
in his official capacity as
Commissioner of the Public Service
Commission of West Virginia; and
R. MICHAEL SHAW, in his official capacity as
Commissioner of the Public Service
Commission of West Virginia,

       Defendants.

WV ASSOCIATION OF SOLID WASTE HAULERS
AND RECYCLERS,
BFI WASTE SYSTEMS OF NORTH AMERICA, INC.,
STEWART'S SANITATION,
SUNRISE SANITATION SERVICES, INC.,
TYGARTS VALLEY SANITATION, INC., and
UNITED DISPOSAL SERVICES, INC.,

       Intervenors-defendants.


<u>MEMORANDUM OPINION AND ORDER</u>

---

[1]  Pursuant to Rule 25(d), Federal Rules of Civil Procedure, the court has substituted the current Chairman and Commissioners of the Public Service Commission for those originally named in the Complaint who no longer serve in those capacities.

Currently pending before the court is Plaintiffs' Renewed[2] Motion for Summary Judgment, filed January 6, 2006 (Docket Sheet Document # 121).  All Defendants have responded to Plaintiffs' Motion (## 125, 127, 128, 132), and Plaintiffs have replied (# 129).  On February 14, 2006, the court heard oral argument.

A.  Statement of Jurisdiction and Authority

The parties have consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c).  This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

B.  Proceedings before PSC & Procedural History before this Court

The underlying proceedings before the Public Service Commission of West Virginia ("PSC") are set forth in detail in the court's Memorandum Opinion and Order entered November 19, 2003, and, as such, the court will not repeat them herein.  (# 39, pp. 2-6.)  In short, following protracted proceedings, the PSC ultimately ordered plaintiff James Allen Harper, doing business as Southern Ohio Disposal LLC ("SOD") to cease and desist collecting solid waste in West Virginia until he obtains a certificate of convenience and necessity, pursuant to West Virginia Code § 24A-2-5.  (# 1, Exhibit 2, p. 40.)

Plaintiffs, Harper and SOD, filed this action on June 6, 2003, alleging that the certification requirement violates the Commerce

_____

[2]  By Order entered July 8, 2005, the court denied without prejudice a motion for summary judgment filed on the same grounds as the instant Motion and allowed the parties to engage in discovery as set forth in the scheduling order. (# 86.)

Clause, that State statutes were misapplied and that the PSC and
its Commissioners (collectively referred to as the "PSC"), acting
under color and pretense of State statute, regulation and customs
and usages, engaged in illegal conduct as alleged in the Complaint
to injure Plaintiffs and deprive them of their rights, privileges
and immunities secured by the Commerce Clause of the United States
Constitution and 42 U.S.C. § 1983.   (# 1, ¶¶ 18, 19, 20-24.)
Plaintiffs seek a temporary restraining order and, thereafter,
preliminary and permanent injunctions against the PSC, prohibiting
the enforcement of PSC orders or otherwise interfering with SOD's
interstate transportation of solid waste from West Virginia and
other states.   Plaintiffs further request that the court declare
the rights, duties and obligations of the parties with respect to
such transportation and other aspects of SOD's business, resolve,
to the extent necessary, Plaintiffs' challenges to the PSC orders,
and award Plaintiffs their fees and costs pursuant to 42 U.S.C. §
1988.  (# 1, Prayer for Relief.)

On Defendants' motions to dismiss, this court originally
abstained pursuant to Younger v. Harris, 401 U.S. 37 (1971) and
Burford v. Sun Oil Co., 319 U.S. 315 (1943), and was reversed on
appeal before the United States Court of Appeals for the Fourth
Circuit.  Harper v. Public Service Comm'n, 291 F. Supp.2d 443 (S.D.
W. Va. 2003), rev'd, 396 F.3d 348 (4th Cir. 2005).  Upon remand
from the Fourth Circuit, the court has permitted discovery in the

case and has fully and carefully considered the Motion currently pending before it.

C.   Undisputed Facts

SOD, an Ohio limited liability company owned by plaintiff James Allen Harper, also a resident of Ohio, operates a solid waste disposal service.  From a base in Pomeroy, Ohio, SOD employees drive garbage trucks to residences and businesses of customers in Mason County, West Virginia and Ohio, empty refuse containers into the trucks, and then drive the trucks to a transfer station in Pomeroy, Ohio or a landfill near Nelsonville, Ohio, for disposal of the waste.  SOD does not dispose of waste in West Virginia.

West Virginia Code § 24A-2-5 (2004), originally enacted in 1937, provides that "[i]t shall be unlawful for any common carrier by motor vehicle to operate within this state without first having obtained from the commission a certificate of convenience and necessity."  At the hearing on Plaintiffs' Motion, all parties agreed that the stated purpose of requiring a solid waste collector/hauler to obtain a certificate is to further the goal under the West Virginia Solid Waste Management Act of providing universal trash service to the citizens of West Virginia at reasonable rates.[3]

West Virginia is one of only two states in the country that requires certification for solid waste haulers.  The court in

_____

[3]  In 1994, the State of West Virginia enacted the Solid Waste Management Act.  The relevant provisions of that statute are discussed below.

4

Medigen of Kentucky, Inc. v. Public Service Comm'n, 787 F. Supp. 590, 592-93 (S.D. W. Va. 1991), aptly explained the certification process before the PSC:

> [u]pon application for the certificate, a legal notice of the application is published in the proposed area of operation and existing transporters are given the opportunity to oppose the application. If no protest is made, the certificate may be granted without hearing. If protest is received, the applicant must appear at a hearing and demonstrate that the public convenience and necessity require the proposed service. Existing transporters may present contradictory evidence.
>
> In considering the application, the PSC must consider the existing transportation services in the area to be served and if the existing services are reasonably efficient and adequate, the certificate will not be granted. In addition to the required showing of convenience and necessity, applicants must show financial ability, experience and fitness. All contested applications are judged by the same legal standards. Once issued, certificates of convenience and necessity have no expiration date. The PSC has authority to require a certificate holder to provide service to all members of the public within its certificate area. In addition, the PSC regulates other aspects of the transporter's operations, including rates charged to customers.

(citations omitted).

Plaintiffs never applied for a certificate of convenience and necessity from the PSC pursuant to West Virginia Code § 24A-2-5. At the hearing on Plaintiffs' Motion, the PSC indicated there were no significant complaints against BFI, the current hauler in the area where Plaintiffs wish to serve.

Some out-of-state companies, such as Waste Management and defendant BFI, both Delaware corporations, hold certificates pursuant to West Virginia Code § 24A-2-5. Waste Management and BFI

are the two largest certificate holders in the State.  Many of these out-of-state companies obtained their certificates by transfer when they acquired smaller West Virginia companies that already held certificates for certain areas; others obtained them by their own application.

D.  Regulatory Scheme

In the West Virginia Solid Waste Management Act, enacted in 1994, the West Virginia legislature professed its purpose of "establish[ing] a comprehensive program of controlling all phases of solid waste management."  W. Va. Code § 22-15-1(a) (2002).  The legislature found that

> solid waste disposal has inherent risks and negative impact on local communities and specifically finds the following: (1) Uncontrolled, inadequately controlled and improper collection, transportation, processing and disposal of solid waste is a public nuisance and a clear and present danger to people; (2) provides harborages and breeding places for disease-carrying, injurious insects, rodents and other pests harmful to the public health, safety and welfare; (3) constitutes a danger to livestock and domestic animals; (4) decreases the value of private and public property, causes pollution, blight and deterioration of the natural beauty and resources of the state and has adverse economic and social effects on the state and its citizens; (5) results in the squandering of valuable nonrenewable and nonreplenishable resources contained in solid waste; (6) that resource recovery and recycling reduces the need for landfills and extends their life; and that (7) proper disposal, resource recovery or recycling of solid waste is for the general welfare of the citizens of this state.

W. Va. Code § 22-15-1(c).

To accomplish these goals, the legislature enacted an extensive statutory scheme that addresses many aspects of solid

6

waste management, including mandatory disposal and proof thereof by each person in West Virginia occupying a residence or business, management of solid waste facilities and sewage sludge and waste tire management, among others.  W. Va. Code §§ 22C-4-10(a)(1)-(2) (2005), 22-15-20 (2002) and 22-15-21 (2002).   Rules were promulgated and adopted as well.   See 33 CSR 1 (Solid Waste Management), 33 CSR 2 (Sewage Sludge Management), 33 CSR 5 (Waste Tire Management), 33 CSR 7 (Proof of Proper Solid Waste Disposal).

West Virginia Code § 22C-3-23, related to the creation and role of a Solid Waste Management Board, states that "[s]olid waste collectors and haulers who are 'common carriers by motor vehicle,' as defined in ... [§ 24A-1-2] ... shall continue to be regulated by the public service commission in accordance with the provisions of ... [§ 24A-1-1 et seq.] and rules promulgated thereunder."  W. Va. Code § 22C-3-23 (2005); see also W. Va. Code § 24A-2-4a (2004) (motor carriers transporting solid waste; pass through of landfill tip fees as rate surcharge).   The statute further provides that

> [n]othing in this article gives the board any power or right to regulate such solid waste collectors and haulers in any manner, but the public service commission, when it issues a new certificate of convenience and necessity ... shall consult with the board regarding what action it could take which would most likely further implementation of the board's solid waste disposal shed plan and solid waste disposal projects and shall take any reasonable action that will lead to or bring about compliance of such waste collectors and haulers with such plan and projects.

W. Va. Code § 22C-3-23.

7

The PSC promulgated and adopted rules under West Virginia Code §§ 24A-2-3, 24A-3-4, 24A-3-6 and 24A-5-5 applicable to motor carriers transporting solid waste. The rules relate to conditions of services, termination of service for nonpayment, participation by common carriers in recycling programs, providing lists of residential customers or of nonsubscribing residents to solid waste authorities, and establishment of monthly bulky goods collection services. 150 CSR 9.7.1 through 9.7.6.

E.   A Sampling of the Parties' Expert Opinions

As stated above, the parties agree that the purpose of requiring a solid waste collector/hauler to obtain a certificate is to further the goal under the Solid Waste Management Act of providing universal trash service to the citizens of West Virginia at reasonable rates. The parties dispute whether this goal would be achieved if there were no certification requirement and no regulation by the PSC.[4]

Very briefly, Plaintiffs' expert, Molly K. Macauley, Ph.D., concludes that

> competition in Mason County's solid waste collection and hauling services is workable in light of the successful practices in other localities. However, "workability" requires facilitating, not restricting, entry and exit in

---

[4] Plaintiffs moved to strike four of Defendants' experts pursuant to Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), because three of the four are not qualified and because the opinions of all four are not properly supported. By order entered February 16, 2006, the court denied Plaintiffs' motion and opted instead to assess the reports and depositions of all four witnesses and hear their testimony and then assign them such weight as is appropriate under the circumstances. (# 142.)

8

the market.  Easy entry and exit is in the interest of
the County as an essential disciplining influence in
market pricing.  In addition, interstate shipping of
solid waste to low-cost landfills is in the interest of
the County.  Societal goals of universal service and
affordable pricing are independent of market structure.

(# 105, Exhibit, p. 14.)

David J. Ellis, the PSC's expert, opines in his report

that solid waste collection is cloaked in the public
interest from a health and safety standpoint, and since
solid waste collectors serve fixed customer locations on
a regularly scheduled basis over a regular route, this
business takes on the attributes of a traditional public
utility.  Given those attributes, the state has an
interest in assuring universal service at reasonable
rates for all customers.  In West Virginia, this interest
is accommodated by regulating solid waste collection the
same as a traditional electric, gas, water or sewer
public utility is regulated.

(# 94, p. 7.)  Mr. Ellis contends that "West Virginia is uniquely

incompatible with deregulation of solid waste collection due to the

rural nature of the state and the magnified impact on average costs

per customer that would be felt in West Virginia if solid waste

collection were thrown open to competition and already low customer

densities made even lower."  (# 94, p. 9.)

Patrick Mann, Ph.D., BFI's expert, states that "[t]he rural

nature of West Virginia is important in that the costs of garbage

collection [solid waste disposal] is [sic] highly sensitive to

differences in population density across counties as well as within

counties."  (# 92, p. 1.)  According to Dr. Mann, "[t]he key

implication of the population density effect is that if a service

provider such as Southern Ohio Disposal enters a service area of

another provider [the incumbent] and only provides service to users in the high population density [low provision cost] areas, the fixed costs of the incumbent provider must be recovered from the users in the low population density [high provision costs] areas." (# 92, p. 1.)  Dr. Mann concludes that "[i]n a deregulated environment for garbage collection in Mason County, rates will most likely decline for users in the high population density areas. Garbage collection rates will most likely increase for users in the low population density areas." (# 92, p. 3.) Dr. Mann states that "considerations such as fairness, affordability, and universal service must be balanced against the objective of economic efficiency in the regulatory process.  These considerations must be viewed as restraints against the unqualified acceptance of the efficiency advantages of competition in markets such as garbage collection." (# 92, p. 4.)

In his supplemental report, Dr. Mann observes that "the competitive market system involves higher costs than the private monopoly system for cities of all sizes" and "it is more efficient to have a single private supplier of services, provided that ... either the rate regulation is effective or that the contract process insures competition." (# 123, Tab B1, pp. 2-3.)  In addition, "[r]ural refuse collection presents problems that are somewhat different from the problems of urban and suburban refuse collection," and "rural refuse collection is associated with

illegal dumping, high capital and operating costs, and logistical problems in mountainous areas." (# 123, Tab B1, pp. 3-4.)

Dr. Mann further states that in Ohio, a State where waste collection has been deregulated, there have been positive effects on consumer bills, but that "a downside to the competitive waste collection in Ohio may be the lack of choices presented to consumers living in rural areas with poor roads. These rural customers may end up paying higher garbage fees than comparable rural customers in West Virginia." (# 123, Tab B1, pp. 4-5.)

Finally, Dr. Mann states that if partial deregulation were permitted, thereby allowing limited competition, this would produce "cream skimming" by the new entrant. (# 123, Tab B1, p. 5.) Cream skimming results when a new entrant provides service "to only the users in the high population density [low cost] areas, with the incumbent left to provide service to users in the low population density [high cost] areas." (# 92, p. 2.) As a result, Dr. Mann concludes that partial deregulation will jeopardize the concept of universal service, and will produce higher rates for the remaining customers of the certificated waste hauler. (# 123, Tab B1, p. 5.)

F. Arguments of the Parties

1. Plaintiffs' Motion

Plaintiffs move for summary judgment asking the court to permanently enjoin Defendants from enforcing the subject orders of the PSC referenced above or otherwise interfering with SOD's

interstate transportation of solid waste from West Virginia to other states. (# 122, p. 1.) Plaintiffs assert that the "question in this case is whether West Virginia may, under the Commerce Clause, *U.S. Const.* Art I, § 8, cl. 3, decree through certification based on a showing of unmet 'public convenience and necessity' which motor carriers may use public highways to transport solid waste to another state for lawful disposal" and that this question must be answered in the negative. (# 122, p. 2.) Plaintiffs maintain that the evidence in this proceeding should be limited to that presented to the PSC. (# 122, p. 3, n.2.)

Plaintiffs primarily rely on the United States Supreme Court cases of <u>Buck v. Kuykendall</u>, 267 U.S. 307 (1925) and <u>George W. Bush & Sons Co. v. Maloy</u>, 267 U.S. 317 (1925), decided the same year, and the more recent case of <u>C & A Carbone, Inc. v. Town of Clarkstown</u>, 511 U.S. 383 (1994). Based on these precedents, Plaintiffs assert that "no state may require an interstate carrier to obtain a certificate based on a showing of need" and that because "W. Va. Code § 24A-2-5 purports to certify motor carriage as such, and reserves unto the PSC the right to tell carriers that they may not enter already occupied commercial fields, the statute is unconstitutional as applied to SOD's business of hauling waste from West Virginia to Ohio." (# 122, p. 7.)

Plaintiffs further assert that if the court chooses not to apply the <u>Buck</u>, <u>Bush</u> and <u>Carbone</u> line of cases, and instead,

12

applies <u>Medigen of Kentucky, Inc. v. Public Service Comm'n</u>, 787 F. Supp. 590, 592-93 (S.D. W. Va. 1991) ("<u>Medigen I</u>") and <u>Medigen of Kentucky, Inc. v. Public Service Comm'n</u>, 787 F. Supp. 602, 608-09 (S.D. W. Va. 1992) ("<u>Medigen II</u>"), <u>aff'd</u>, 985 F.2d 164 (4th Cir. 1993) ("<u>Medigen-Fourth Circuit</u>"), they still are entitled to summary judgment.  Plaintiffs assert that pursuant to <u>Medigen</u>, and the test cited therein from <u>Maine v. Taylor</u>, 477 U.S. 131 (1986), Defendants cannot prove both that the certificate requirement serves a legitimate local purpose and that no other means can adequately serve that purpose.  (# 122, pp. 7-8.)  Plaintiffs cite to the words of the Chief Administrative Law Judge who presided at the PSC hearing.  She found that

> "[j]ust as in the <u>Medigen</u> opinion, the idea that competition in the garbage collection industry in West Virginia would result in ruinous competition must be rejected in this case.  Again, while the testimony of Mr. Steward and Dr. Sweetser theorized that such ruinous competition may occur without [market] entry regulation, the record is devoid of any actual data to support this theory."

(# 122, p. 8 (quoting Recommended Decision entered July 9, 2001, attached to the Complaint (# 1) as Exhibit 1)).

According to Plaintiffs,

> [a]t this point, more than four years after the PSC's own Chief Administrative Law Judge noted the lack of any evidentiary support, one wonders why the PSC has not bothered to gather anything beyond what Dr. Sweetser himself described back in 2001 as 'anecdotal' evidence that was 'not conclusive in any way' (*Tab A*: 219 (Sweetser)) to test the efficacy of need-based certification under the Commerce Clause.  No facts were presented to the PSC, and four years later the PSC has

13

> none to present to this Court, to validate anyone's
> theory about how West Virginia can only regulate the
> garbage industry in this most restrictive of all
> conceivable ways.

(# 122, p. 8.)  Indeed, Plaintiffs aver that "[i]n Wood County, one of the few areas in West Virginia where there are competing PSC certificants, the rates are *lower*, as noted at page 20 of the Recommended Decision issued by the PSC's Chief Administrative Law Judge (*see* Exhibit 1 to complaint)."  (# 122, p. 8.)  Plaintiffs cite to a variety of other less restrictive approaches, including "registration of vehicles, filing of rates, ... regulation as to terms and conditions of service" and "allowing vendors to compete from time to time for limited-term franchises."  (# 122, pp. 10-11.)

   2.  Defendants' Responses

      a.  WV Association of Solid Waste Haulers ("SWH")

   Regarding the record before this court, SWH points out that this court permitted discovery and further development of the record by its scheduling order entered April 5, 2005, and that this discovery was appropriate in light of the fact that SWH and others were not parties to the PSC proceeding at the evidentiary stage. (# 125, pp. 2-3.)

   SWH asserts that Plaintiffs' argument that they are entitled to summary judgment based on the Supreme Court precedent of Buck, Bush and Carbone was rejected by the United States Court of Appeals for the Ninth Circuit in Kleenwell Biohazard Waste and General

14

Ecology Consultants, Inc. v. Nelson, 48 F.3d 391 (9th Cir. 1995)
and should also be rejected by this court.  (# 125, pp. 3-4.)

Turning to the Medigen cases, SWH argues that according to
Hughes v. Oklahoma, 441 U.S. 322 (1979), "the Supreme Court has
held that the party challenging the regulation has the burden of
demonstrating that the regulation has a discriminatory purpose or
effect." (# 125, p. 4.)  Because "[a]ny person or company, whether
in-state or out-of-state, may apply for a certificate of
convenience and necessity," SWH asserts that Plaintiffs have not
met this burden.  (# 125, pp. 4-5.)

SWH believes that, rather than apply the test set forth in
Maine, the court should apply the test set forth in Pike v. Bruce
Church, Inc., 397 U.S. 137 (1970).  (# 125, p. 5.)  SWH asserts
that under Pike, it is Plaintiffs who must establish that the
statute's burden on interstate commerce clearly outweighs the local
benefits arising from it.  SWH contends that Kleenwell is analogous
to the instant matter.  SWH avers that the current regulatory
system in West Virginia allows for universal garbage service at
reasonable rates and without this system, the concept of universal
service at reasonable rates would be destroyed.  (# 125, p. 7.)
Finally, SWH distinguishes Medigen-Fourth Circuit by arguing that
in that case, the United States Court of Appeals for the Fourth
Circuit found no basis on the record for concluding that
competition in the market has had or will have destructive effects,

15

yet in the instant matter, "the record is replete with evidence [from Defendants' experts] that competition in the market place will have destructive effects." (# 125, p. 7.)

      b.  <u>Stewart's Sanitation, et al.</u>

Stewart's Sanitation, Sunrise Sanitation Services, Inc., Tygarts Valley Sanitation, Inc. and United Disposal Services, Inc. (collectively referred to as "Intervening Certificate Holding ("CH") Defendants") all hold one or more certificates of convenience and necessity from the PSC and serve rural areas including Tucker, Randolph and Barbour counties in West Virginia. The Intervening CH Defendants explain that Sunrise Sanitation, Inc. is typical of the Intervening CH Defendants in that it is a West Virginia corporation with twenty-one employees currently providing residential, commercial and industrial service in Grant, Randolph, Pendleton and Tucker counties in West Virginia and in Garrett County, Maryland. (# 127, p. 2, Exhibit 1, pp. 6-8.)

The Intervening CH Defendants acknowledge that determining the standard to be applied in analyzing whether a statute violates the Commerce Clause is a difficult task, but that nonetheless, the <u>Pike</u> balancing test used by the Fourth Circuit in <u>Medigen-Fourth Circuit</u> should be applied in the instant matter. The Intervening CH Defendants point out that in <u>Medigen-Fourth Circuit</u>, the Fourth Circuit "had previously criticized the direct-indirect test as analytically unsound and results oriented" and that it chose to

16

apply <u>Pike</u>.  (# 127, p. 5.)  In addition, the Intervening CH Defendants argue that even if the alternative test advocated by Plaintiffs as set forth in <u>Maine</u> is applied, Plaintiffs' claims cannot prevail under the first prong of that test requiring a statute that either discriminates on its face, in its purpose or in its effect.  The Intervening CH Defendants assert that the statute at issue, West Virginia Code § 24A-2-5, does not discriminate against out-of--state interests in any manner, and, instead, "the same burden is imposed on instate and interstate commerce ...." (# 127, p. 7.)  As such, Plaintiffs' claims fail under the <u>Maine</u> strict scrutiny analysis.

The Intervening CH Defendants further assert that West Virginia has a system of solid waste regulation that addresses the safe disposal of solid waste in this rural state.  This system evolved significantly over the years, and West Virginia "adapted its existing system of motor carrier regulation by the PSC to its program of solid waste regulation."  (# 127, p. 10.)  Through its statutes, including West Virginia Code § 22C-4-10, West Virginia seeks to achieve universal service for West Virginia businesses and residences of solid waste.  The PSC's "regulation of motor carriers requiring service to all customers within the motor carriers' service area furthers this regulatory goal."  (# 127, p. 11.)  Thus, according to the Intervening CH Defendants, "West Virginia['s regulation] of motor carriers is an integral part of its effort to

achieve a legitimate state interest: the safe disposal of solid waste in rural areas" and "if there is any burden on interstate commerce it is not clearly excessive in relation to the local benefit." (# 127, p. 11.)

The Intervening CH Defendants further assert that the <u>Medigen</u> line of cases, to the extent they struck down the regulation at issue, can be distinguished. In particular, they argue that the <u>Medigen</u> cases deal "with the regulation of biomedical infectious waste from hospitals and other commercial facilities," while this case deals with solid waste.  In addition, "[t]his is a small group of generators when compared to solid waste which is generated by every residence, commercial business and industry in the state." (# 127, p. 8.)  The Intervening CH Defendants argue that it is equally significant that in the <u>Medigen</u> cases, "all other biomedical infectious waste, except some biomedical infectious waste incinerated by some hospitals, was exported outside of West Virginia for disposal as West Virginia has no facilities for the disposal of such waste." (# 127, p. 8.)  "In contrast, solid waste is freely imported and exported from West Virginia and substantial quantities of solid waste move between West Virginia and other states." (# 127, pp. 8-9.)

The Intervening CH Defendants aver that the nature of the regulation at issue in the <u>Medigen</u> line of cases and in this case is different.  In the <u>Medigen</u> cases, the PSC did not regulate the

18

price charged for the service, while the PSC regulates the price in the instant matter.  According to the Intervening CH Defendants, "[w]ith regard to solid waste, West Virginia's system of regulation includes all the typical elements of a regulated public utility: type of service, area of service, quality of service, and price of service."  (# 127, p. 9.)

Finally, the Intervening CH Defendants assert that the determinations of fact made by the PSC in its October 21, 2002, decision are subject to res judicata and, therefore, must be given preclusive effect by this court.  (# 127, pp. 12-14.)  The Intervening CH Defendants assert that the determination of the PSC that free entry into and exit from the municipal solid waste collection market will vitiate the regulatory plan, result in degradation of service, or no service, for some West Virginians and have a destructive effect on current service providers are significant facts.  According to the Intervening CH Defendants, this fact was absent in the Medigen cases and is the reason the Kleenwell court distinguished the Medigen cases.  (# 127, p. 16.)

      c.  PSC

The PSC also advocates in favor of the Pike test. The PSC asserts that the challenged statute "is silent on and neutral as to whether the would-be market entrant has some nexus to interstate commerce" and instead, "imposes identical requirements on applicants regardless of their state of domicile or incorporation."

(# 128, p. 4.)   In fact, "depositions demonstrate and the record will show that a significant segment of incumbent providers of garbage service in West Virginia are owned and operated by foreign corporations (a category which includes intervening defendants herein)."   (# 128, p. 4.)

The PSC argues that West Virginia Code § 24A-2-5, when read in pari materia with West Virginia Code § 24-2-1 establishes the collection of solid waste by motor vehicle as a public utility service.   Like other public utility services, garbage collection produces a waste product.   Even "though these waste products may eventually move, by truck or otherwise, in interstate commerce, the fact that they so move is incidental to the provision of utility service – service of an essentially local nature provided wholly within state boundaries."   (# 128, p. 5.)   According to the PSC, Plaintiffs therefore are not "restricted from engaging in interstate commerce (transporting solid waste) by the certification requirement for solid waste collectors."   (# 128, p. 5.)   The PSC characterizes Plaintiffs' position as urging the court "to equate market entry regulation of solid waste collectors operating wholly within West Virginia to a restriction on the transportation of solid waste from West Virginia to Ohio" and cautions the court against such an "overly simplistic" approach.   (# 128, p. 5.)   The PSC relies on its orders and the findings therein as support for the position that this case involves the intrastate market for

collection of solid waste and that "any incidental burden imposed on interstate commerce by the certification requirement for collection companies is substantially outweighed by the local benefits of the comprehensive solid waste management scheme." (# 128, pp. 6-10.)

The PSC distinguishes Buck by arguing that unlike Buck's "restriction of shipments of goods between states, the transportation of previously collected waste is not a 'shipment', in the classical sense, by the generators of that waste." (# 128, p. 6.) Instead, "[t]hat waste is the incidental by-product of the essentially local utility service contract or agreement between the collection company ... and [its] customer." (# 128, p. 6.) According to the PSC, Plaintiffs "should not be permitted to use [their] incidental business decision ... to implicate the Commerce Clause, and thus, to vitiate the efficient and long-standing regulatory scheme for solid waste management in West Virginia." (# 128, p. 6.)

The PSC points out that Buck has been criticized as inartful in several decisions and taken to its logical conclusion, Plaintiffs' interpretation of Buck "would find any and all state regulation of local markets tantamount to a 'direct' - and, accordingly, invalid - burden on interstate commerce." (# 128, p. 11.) In short, according to the PSC "[h]ere we speak of a burden prerequisite to engaging in *intrastate* solid waste collection.

This must not be confused by Plaintiffs' claim they have been somehow restricted in engaging in interstate transportation of waste or any other commodity."  (# 128, p. 13.)

Finally, like the Intervening CH Defendants, the PSC argues that the <u>Medigen</u> cases are distinguishable, both factually and because the instant matter involves a "significantly different and more compelling" regulatory scheme.  While the PSC acknowledges the relevancy of the <u>Medigen</u> cases, it questions whether they are dispositive.  (# 128, p. 14.)  Unlike the <u>Medigen</u> cases, wherein the District Court determined that the evidence did not show that the certificate requirement helped insure statewide availability of medical waste collection and transportation service, the record in the instant case "could scarcely be more demonstrative in this respect."  (# 128, p. 15.)  According to the PSC, "the record in this case will demonstrate that, but for the challenged regulation, curbside solid waste collection at a market-acceptable rate would not be available at virtually every household, business and institution in West Virginia."  (# 128, p. 15.)

       d.  <u>BFI</u>

As with all the Defendants, BFI takes issue with Plaintiffs' framing of the issue as one involving the interstate transportation of solid waste.  BFI asserts that it does not agree that "this case is merely about the Plaintiffs['] desire to travel from Ohio to collect solid waste in Mason County, West Virginia and return to

Ohio to dispose of the waste."  (# 132, p. 2.)  "While that may be Mr. Harper's perspective, Intervenor Defendant BFI sees this case [as being] about the State of West Virginia choosing a statewide system to regulate solid waste collection and disposal."  (# 132, p. 2.)

BFI asserts that there are genuine disputes of material fact that preclude the court from granting Plaintiffs' Motion.  (# 132, pp. 6-7.)  In addition, BFI seeks guidance from the court regarding the standard the court intends to apply in the case. (# 132, p. 9.)

BFI argues that the court, in its July 8, 2005, order rejected the applicability of <u>Buck</u>, <u>Bush</u> and <u>Carbone</u> (# 132, p. 9), and that, in any event, it is admitted that there are "no allegations of discrimination based upon in-state versus out-of-state interests based upon W. Va. Code § 24A-2-5." (# 132, p. 9.)  BFI points out that Plaintiffs have admitted that it and Waste Management are Delaware corporations.  (# 132, p. 10.)  BFI argues that "[t]he fact that two Delaware corporations have come into the State of West Virginia and applied under W. Va. Code § 24A-2-5 for certificates of convenience and necessity with the Public Service Commission and through the acquisition of other companies they have both grown to become the two largest waste haulers in the State, belies any argument by the Plaintiffs in this case that the statute at issue discriminates against out-of-state companies." (# 132, p. 11.)

BFI asserts that the Medigen cases are distinguishable (# 132, pp. 11-15), and that this court should consider other cases including Kleenwell, Ben Oehrleins and Sons and Daughter, Inc. v. Hennepin County, 115 F.3d 1372 (8th Cir. 1997), and American Trucking Ass'ns, Inc. v. Michigan Public Service Comm'n, 125 S. Ct. 2419 (2005) (# 132, pp. 15-19). BFI argues that American Trucking suggests "that the Plaintiffs here bear some empirical burden of proof to establish that the certificate provisions of W. Va. Code 24A-2-5 impose a burden on interstate commerce." (# 132, p. 18.)

Finally, BFI states that Plaintiffs' expert, Dr. Macauley, set forth several alternatives to the current regulatory scheme, including that many local communities enter into exclusive contracts with solid waste hauling companies to provide for the collection and disposal of solid waste. (# 132, p. 19 and Exhibit D, pp. 82-84.) BFI asserts that "Dr. Macauley admits, the effect of a government body entering into an exclusive franchise agreement also leads to exclusion of the solid waste hauling company that does not win the bid from participating in any business activity in that jurisdiction." (# 132, p. 19.) According to BFI, "[t]his Court is left then to consider – how is a hypothetical system of exclusive franchises for the collection of solid waste within a jurisdiction, which has been upheld by the Courts, any different in effect, from the certificate system presently operating in West

Virginia under W. Va. Code § 24A-2-5."   (# 132, pp. 19-20.)

    3. <u>Plaintiffs' Reply</u>

Regarding the applicability of <u>res judicata</u>, the argument set forth by the Intervening CH Defendants, Plaintiffs note that the court has previously determined that the PSC's evidentiary record can be augmented. (# 129, p. 3.)

Plaintiffs continue to argue that the statute at issue directly burdens interstate commerce. Plaintiffs assert that the Fourth Circuit in <u>Medigen</u> did not reverse Judge Copenhaver's decision not to use the <u>Pike</u> test, and "did ***not*** state that <u>Pike</u> should be used; rather, it found that W. Va. Code § 24A-2-5 would fail even ***if*** <u>Pike</u> were to have been used."   (# 129, p. 4.) Plaintiffs contend that the PSC should have to reconcile its concession in the <u>Medigen</u> cases that the certification requirement imposes a significant burden on interstate commerce with its assertion in this case that West Virginia Code § 24A-2-5 only incidentally burdens Plaintiffs' transportation of waste in interstate commerce. (# 129, p. 5.) Plaintiffs state that the PSC's assertions (that it wishes to regulate Plaintiffs under West Virginia Code § 24A-2-5 as waste collectors only and not motor carriage) are contrary to the language of the statute, and the PSC's own May 30, 2003, order. (# 129, pp. 6-8.)

Plaintiffs dispute BFI's characterization of Dr. Macauley's report and assert that Dr. Macauley "repeatedly made clear ...

there is no evidence that market competition will leave West Virginians unserved, but that if such a situation should come to pass, competitively bid franchising, subsidization, or other less intrusive alternatives to certification-based market regulation are all better ways to address the concern of universal service."  (# 129, p. 9.)

G.   Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Pursuant to Rule 56(c), a district court must enter judgment against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Stated differently, "[t]o prevail on a motion for summary judgment, [the moving party] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law."  Harleysville Mut. Ins. Co. v. Packer, 60 F.3d 1116, 1119-20 (4th Cir. 1995) (citing Anderson v.

26

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  In determining

whether a genuine issue of material fact has been raised, the court

> must construe all inferences in favor of the [nonmoving
> party].  If, however, the evidence is so one-sided that
> one party must prevail as a matter of law, we must affirm
> the grant of summary judgment in that party's favor.  The
> [nonmoving party] "cannot create a genuine issue of fact
> through mere speculation or the building of one inference
> upon another[.]"  To survive [the summary judgment]
> motion, the [nonmoving party] may not rest on their
> pleadings, but must demonstrate that specific, material
> facts exist that give rise to a genuine issue.  [T]he
> "mere existence of a scintilla of evidence in support of
> the plaintiff's position will be insufficient; there must
> be evidence on which the jury could reasonably find for
> the plaintiff[.]"

<u>Id.</u> at 1120 (citations omitted).  "Where the record taken as a

whole could not lead a rational trier of fact to find for the non-

moving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>

<u>Elec. Indus. Co. v. Zenith Radio Corp</u>. 475 U.S. 574, 587 (1986)

(citation omitted).

"At bottom, the district court must determine whether the

party opposing the motion for summary judgment has presented

genuinely disputed facts which remain to be tried. If not, the

district court may resolve the legal questions between the parties

as a matter of law and enter judgment accordingly." <u>Thompson</u>

<u>Everett, Inc. v. National Cable Adver.</u>, 57 F.3d 1317, 1323 (4th

Cir. 1995).

H.  <u>Analysis</u>

The Commerce Clause grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const. Art. I, § 8, cl. 3.

> The few simple words of the Commerce Clause ... reflected a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.

<u>Hughes v. Oklahoma</u>, 441 U.S. 322, 325-26 (1979) (citing <u>H.P. Hood & Sons, Inc. v. Du Mond</u>, 336 U.S. 525, 533-34 (1949)).

As the Fourth Circuit explained in <u>Yamaha Motor Corp. v. Jim's Motorcycle, Inc.</u>, 401 F.3d 560, 567 (4th Cir. 2005)

> [a]lthough the Clause speaks only of congressional power, the Supreme Court since 1852 "has construed the Commerce Clause as incorporating an implicit restraint on state power even in the absence of congressional action - hence the notion of a 'dormant' Commerce Clause."

(quoting 1 Laurence H. Tribe, American Constitutional Law § 6-2, at 1030 (3d ed.2000)).  "The dormant Commerce Clause thus 'limits the power of the States to erect barriers against interstate trade.'" <u>Id.</u> (quoting <u>Dennis v. Higgins</u>, 498 U.S. 439, 446 (1991)).

> This limitation upon state power, of course, is by no means absolute. In the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of "legitimate local concern," even though interstate commerce may be affected. Where such legitimate local interests are implicated, defining the appropriate scope for state regulation is often a matter of "delicate adjustment." Yet even in regulating to protect local interests, the

28

> States generally must act in a manner consistent with the "ultimate ... principle that one state in its dealings with another may not place itself in a position of economic isolation." However important the state interest at hand, "it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently."

Lewis v. BT Inv. Mgrs. Inc., 447 U.S. 27, 36 (1980) (citations omitted).

Plaintiffs urge this court's reliance on the Supreme Court cases of Buck v. Kuykendall, 267 U.S. 307 (1925) and George W. Bush & Sons Co. v. Maloy, 267 U.S. 317 (1925), both decided the same day over eighty years ago. Plaintiffs further assert Buck was "reiterated" in the more recent Supreme Court decision of C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383 (1994). In short, it appears Plaintiffs believe the court, relying on Buck and Bush and Buck's "reiteration" in Carbone should find that "[u]nder the Commerce Clause, no state may require an interstate carrier to obtain a certificate based upon a showing of need" and that because West Virginia Code § 24A-2-5 imposes such a requirement and "tells carriers that they may not enter already occupied commercial fields, the statute is unconstitutional as applied" to Plaintiffs' business of hauling waste from West Virginia to Ohio. (# 122, p. 7.) Stated differently, Plaintiffs essentially submit that the statute is invalid per se, and, as a result, further inquiry is unnecessary and they are entitled to judgment as a matter of law.

29

If it were only so simple.  It is not, as the following discussion reveals.

In Buck, the State of Washington enacted a statute that prohibited common carriers for hire from using the highways without first obtaining a certificate of public convenience and necessity, and the highest court of the State of Washington had construed the statute as applying to common carriers engaged exclusively in interstate commerce.  The plaintiff in Buck was a citizen of the State of Washington, and he wished to operate an auto stage line over the Pacific Highway between Seattle, Washington and Portland, Oregon (a highway built with federal assistance) as a common carrier for hire exclusively for through interstate passengers and express.  The plaintiff obtained the necessary license from Oregon and applied for a certificate of public convenience and necessity from the State of Washington, but was denied.  Buck, 267 U.S. at 312-13.

The Supreme Court in Buck struck down the Washington statute as a violation of the Commerce Clause, finding that the provision's

> primary purpose is not regulation with a view to safety
> or to conservation of the highways, but the prohibition
> of competition.  It determines, not the manner of use,
> but the persons by whom the highways may be used.  It
> prohibits such use to some persons, while permitting it
> to others for the same purpose and in the same manner.

Id. at 315-16.  Thus, the Court concluded that the statutory provision was "a regulation, not of the use of its own highways, but of interstate commerce.  Its effect upon such commerce is not

30

merely to burden, but to obstruct, it.  Such state action is forbidden by the commerce clause." Id. at 316.

In Bush, the State of Maryland prohibited motor vehicle freight transporters from using the public highways without first obtaining a permit, which pursuant to statute, could be denied if granting it would be prejudicial to the welfare and convenience of the public.  The plaintiff applied for a permit to conduct an exclusively interstate business as a common carrier of freight over specified routes and was denied the permit.  Bush, 267 U.S. at 323-24.  The Court in Bush found Maryland's statute unconstitutional because although federal aid was not involved, the Maryland statute conflicted with federal aid legislation, which makes "clear the purpose of Congress that state highways shall be open to interstate commerce ...." Id. at 324.

The Court in City of Philadelphia v. New Jersey, 437 U.S. 617, 623-24 (1978), explained that

> [t]he opinions of the Court through the years have reflected an alertness to the evils of "economic isolation" and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people.  Thus, where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected.

(citing Buck, 267 U.S. at 315-16 and others).  The court noted that "[t]he clearest example of such legislation is a law that overtly

blocks the flow of interstate commerce at a State's borders."  Id. at 624.

In comparison, the Court in City of Philadelphia stated that "where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a much more flexible approach, the general contours of which were outlined" in Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).  Id.  Pursuant to Pike,

> [w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.

Pike, 397 U.S. at 142 (citing Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 443 (1960)).  Thus, "[i]f a legitimate local purpose is found, then the question becomes one of degree.  And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."  Id.

In Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 537, 579 (1986), the Court pointed out

> that there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the Pike v. Bruce Church balancing approach.  In either situation the critical consideration is the overall effect of the statute on both local and interstate activity.

In <u>Baltimore Gas and Elec. Co. v. Heintz</u>, 760 F.2d 1408, 1420 (4th Cir.), <u>cert. denied</u>, 474 U.S. 847 (1985), the United States Court of Appeals for the Fourth Circuit, citing the decision of the Supreme Court in <u>Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n</u>, 461 U.S. 375 (1983), stated that the Supreme Court has recently "indicated that it may be no longer adhering to the direct/indirect distinction" set forth above.   In <u>Arkansas</u>, the Court stated that

> it is difficult to square [a prior line of cases] based on a supposedly precise division between "direct" and "indirect" effects on interstate commerce, with the general trend in our modern Commerce Clause jurisprudence to look in every case to "the nature of the state regulation involved, the objective of the state, and the effect of the regulation upon the national interest in the commerce."

<u>Arkansas</u>, 461 U.S. at 390 (quoting <u>Illinois Natural Gas Co. v. Public Serv. Co.</u>, 314 U.S. 498, 505 (1942)).

In 1986, the Supreme Court decided <u>Maine v. Taylor</u>, 477 U.S. 131, 138 (1986).   In <u>Maine</u>, the statute at issue facially discriminated against interstate trade by prohibiting the importation of live baitfish.   <u>Id.</u> at 132.   In <u>Maine</u>, the Court acknowledged that the statute

> restricts interstate trade in the most direct manner possible, blocking all inward shipments of live baitfish at the State's border.  Still, as both the District Court and the Court of Appeals recognized, this fact alone does not render the law unconstitutional.  The limitation imposed by the Commerce Clause on state regulatory power "is by no means absolute," and "the States retain authority under their general police powers to regulate

33

matters of 'legitimate local concern,' even though interstate commerce may be affected."

Id. 137-38 (quoting Lewis, 447 U.S. at 36).  Thus, statutes that burden interstate transactions only incidentally are evaluated under the Pike test, but in those cases where a statute "affirmatively discriminate[s] against" interstate transactions "'either on its face or in practical effect,' the burden falls on the State to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." Id. at 138 (quoting Hughes, 441 U.S. at 336).  The Court in Maine ultimately determined that the statute did not violate the Commerce Clause because it served a legitimate local purpose that could not be served as well by available nondiscriminatory means.  Id. at 151-52.

In Medigen of Kentucky, Inc. v. Public Service Comm'n, 787 F. Supp. 590, 600 (S.D. W. Va. 1991) ("Medigen I"), Judge Copenhaver found that West Virginia Code § 25A-2-5, as applied to medical waste transporters, was a "direct rather than an incidental burden on interstate commerce" but

> [i]nasmuch as the Court in Maine found it appropriate to inquire into the state's purpose in enacting a statute that discriminated against interstate commerce on its face and the feasibility of nondiscriminatory solutions, this court concludes that similar inquiry should be made here into defendants' direct regulation of interstate commerce through the requirement of a certificate of convenience and necessity.  The validity of the requirement can be upheld only if the State meets its burden of showing both that the requirement of the

34

certificate "serves a legitimate local purpose" and that no other means can adequately serve that purpose.

In <u>Medigen of Kentucky, Inc. v. Public Service Comm'n</u>, 787 F. Supp. 602, 608-09 (S.D. W. Va. 1992) ("<u>Medigen II</u>"), Judge Copenhaver determined that the certification requirement violated plaintiffs' rights under the Commerce Clause because the record did not support a finding that certification "plays an appreciable role in protecting the health and safety of the public in general or of infectious medical waste workers." Nor did the defendants "meet their burden of showing that the purpose cannot be served by a less restrictive means." <u>Id.</u> at 609.

On appeal, the Fourth Circuit noted that under West Virginia Code § 24A-2-5, "the Commission cannot grant certificates to prospective transporters of infectious waste unless current service is inadequate. Because market entry is only permitted if the Commission determines that the market is not adequately being served, the certification requirement necessarily limits competition, thereby implicating the dormant commerce clause." <u>Medigen of Kentucky, Inc. v. Public Service Comm'n</u>, 985 F.2d 164, 166 (4th Cir. 1993) ("<u>Medigen-Fourth Circuit</u>"). The Fourth Circuit acknowledged the three tests put forth by the parties for determining constitutionality of the certification requirement:

> From most to least deferential, these tests are: (1) the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), under which the regulation is upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative

35

local benefits"; (2) the stricter standard outlined in
*Maine v. Taylor*, 477 U.S. at 138, 106 S.Ct. at 2477
(1986), and applied by the district court; and (3) a test
under which "direct" regulations of interstate commerce
are *per se* unconstitutional, *see George W. Bush & Sons
Co. v. Maloy*, 267 U.S. 317, 324-25, 45 S.Ct. 326, 327, 69
L.Ed. 627 (1925); *Buck v. Kuykendall*, 267 U.S. 307, 315-
16, 45 S.Ct. 324, 325-26, 69 L.Ed. 623 (1925); *cf.
Bradley v. Public Utils. Comm'n*, 289 U.S. 92, 95, 53
S.Ct. 577, 578, 77 L.Ed. 1053 (1933) (distinguishing *Buck*
and *Maloy* as involving anti-competitive regulations that
do not serve any legitimate local purpose).

Id.

In <u>Medigen-Fourth Circuit</u>, the Fourth Circuit affirmed the

underlying decisions of Judge Copenhaver in <u>Medigen I</u> and <u>Medigen</u>

<u>II</u>, and held that "[b]ecause the certification requirement is

unconstitutional even under the deferential balancing test of *Pike*

*v. Bruce Church, Inc.*, we find it unnecessary to decide whether the

requirement should be evaluated under a stricter standard."   <u>Id.</u>

The Fourth Circuit acknowledged that "[t]he Commission contends

that the certification requirement promotes local interests by

insuring that service is available throughout West Virginia at

reasonable prices."   <u>Id.</u> at 167.   The Fourth Circuit disagreed,

finding instead that

[r]estricting market entry, however, necessarily *limits*
the available service because it limits the number of
medical waste transporters from which a medical waste
generator can seek service.  Moreover, restricting market
entry does nothing to insure that services are provided
at reasonable prices.  Without rate regulation, higher
rather than lower prices will more likely result from
limiting competition.  West Virginia's goal of providing
universal service at reasonable rates may well be a
legitimate state purpose, but restricting market entry
does not serve that purpose.

36

In contrast, other aspects of West Virginia's regulatory scheme do serve that purpose. For example, the Commission requires all transporters of infectious waste to offer their services to all medical waste generators within the territories in which they are certified to operate. (J.A. 534-35.) The Commission also regulates the prices transporters charge to their customers. *See* W. Va. Code § 24A-2-4 (requiring common carriers to charge "just and reasonable" rates). These regulatory tools help insure that universal service is provided at reasonable prices. Restricting market entry, on the other hand, does not serve this goal, and hence does not produce the benefits that the Commission urges justify the burden placed on interstate commerce.

The Commission also contends that the certification requirement is necessary because, without it, competition will be ruinous, resulting in monopolization of the market. Certainly where monopolization has destructive effects, regulation may be justified.... We find no basis in the record, however, for concluding that competition in this market has had or will have any destructive effects. Because the "ruinous" effects of competition are entirely speculative, their prevention cannot justify restricting market entry.

Id.

After <u>Medigen-Fourth Circuit</u>, the Supreme Court decided <u>C & A Carbone, Inc. v. Town of Clarkstown</u>, 511 U.S. 383 (1994). In that case, the town of Clarkstown, New York built a new solid waste transfer station to receive bulk solid waste and to separate recyclable from nonrecyclable items. A local private contractor built the facility and agreed to operate it for five years, after which the town would buy it for one dollar. During those five years, the town guaranteed a minimum waste flow of 120,000 tons per year, for which the contractor could charge the hauler a tipping fee of $81.00 per ton, which exceeded the disposal cost of unsorted solid waste on the private market. If the station received less

37

than the 120,000 tons per year, the town promised to make up the tipping fee deficit.   The town enacted a flow control ordinance that required all nonhazardous solid waste within the town to be deposited at the transfer station.   Id. at 387-88.

The plaintiff in Carbone was a company engaged in the processing of solid waste and various related companies or persons. Carbone operated a recycling center in Clarkstown where it received bulk solid waste, sorted and baled it and then shipped it to other processing facilities, much as the new transfer station.   The flow control ordinance permitted recyclers like Carbone to continue to receive solid waste, but under the ordinance, Carbone had to bring the nonrecyclable residue from that waste to the station.   Thus, Carbone was forbidden from shipping the nonrecyclable waste itself and Carbone had to pay a tipping fee on trash that Carbone had already sorted.   Carbone was caught bypassing the new transfer station and transporting its nonrecyclable waste out of state.   Id.

In Carbone, the Court determined that "the flow control ordinance does regulate interstate commerce." Id. at 389.   The Court acknowledged that

> [t]he town says that its ordinance reaches only waste within its jurisdiction and is in practical effect a quarantine: It prevents garbage from entering the stream of interstate commerce until it is made safe. This reasoning is premised, however, on an outdated and mistaken concept of what constitutes interstate commerce.
> While the immediate effect of the ordinance is to direct local transport of solid waste to a designated site within the local jurisdiction, its economic effects are interstate in reach. The Carbone facility in

38

Clarkstown receives and processes waste from places other than Clarkstown, including from out of State. By requiring Carbone to send the nonrecyclable portion of this waste to the Route 303 transfer station at an additional cost, the flow control ordinance drives up the cost for out-of-state interests to dispose of their solid waste. Furthermore, even as to waste originant in Clarkstown, the ordinance prevents everyone except the favored local operator from performing the initial processing step. The ordinance thus deprives out-of-state businesses of access to a local market. These economic effects are more than enough to bring the Clarkstown ordinance within the purview of the Commerce Clause. It is well settled that actions are within the domain of the Commerce Clause if they burden interstate commerce or impede its free flow.

Id.

The Court in Carbone, applying the strict scrutiny test set forth in Maine, stated that while the ordinance does not differentiate solid waste on the basis of its geographic origin,

the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it.
With respect to the stream of commerce, the flow control ordinance discriminates, for it allows only the favored operator to process waste that is within the limits of the town.   The ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition.

Id. at 391 (citing Dean Milk Co. v. City of Madison, 340 U.S. 349, 354 (1951)).

The Court, noting that "[t]he Commerce Clause presumes a national market free from local legislation that discriminates in favor of local interests," found that

Clarkstown has any number of nondiscriminatory alternatives for addressing the health and environmental problems alleged to justify the ordinance in question.

39

> The most obvious would be uniform safety regulations
> enacted without the object to discriminate. These
> regulations would ensure that competitors like Carbone do
> not underprice the market by cutting corners on
> environmental safety.

Id. at 393. Further, the Court found that "[b]y itself, ... revenue generation is not a local interest that can justify discrimination against interstate commerce." Id. The Court observed that "[t]hough the Clarkstown ordinance may not in explicit terms seek to regulate interstate commerce it does so nonetheless by its practical effect and design. In this respect the ordinance is not far different from the state law this Court found invalid in" Buck. Id. at 394.

Finally, and most recently, the Fourth Circuit in Yamaha Motor Corp. v. Jim's Motorcycle, Inc., 401 F.3d 560, 568 (4th Cir. 2005), cert. denied sub. nom. Smit v. Yamaha Motor Corp. and Jim's Motorcycle, Inc. v. Smit, 126 S. Ct. 422 (2005), consistent with the ample Supreme Court precedent cited above, described the applicable test in a Commerce Clause analysis. The court described a two-tiered test, with one tier known as a "discrimination tier" and the other, an "undue burden" tier. Pursuant to the discrimination tier,

> [a] "state law [that] discriminates [against interstate
> commerce] facially, in its practical effect, or in its
> purpose," [citation omitted], will be struck down unless
> the state demonstrates "both that the statute serves a
> legitimate local purpose, and that this purpose could not
> be served as well by available nondiscriminatory means,"
> *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 91
> L.Ed.2d 110 (1986).

40

Id.

"Under the undue burden (or *Pike* balancing) tier, '[w]here a statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" Yamaha, 401 F.3d at 568 (quoting Pike, 397 U.S. at 142).

In Yamaha, the Fourth Circuit reversed the finding of the district court and determined that a Virginia statute that allowed an existing franchised motorcycle dealer in Virginia to protest the establishment of a new dealership for the same brand anywhere in the Commonwealth unduly burdened interstate commerce pursuant to Pike. Id. at 569-73. The court concluded that while the statute did not discriminate on its face, in its purpose or in effect, Id. at 567-68, the statute could not withstand review under Pike, Id. at 569-73. The court concluded that the statute "creates a barrier to market entry because of the 'virtual certainty' of a protest whenever a manufacturer attempts to authorize a new dealership." Id. at 571. "Thus, manufacturers cannot plan franchise expansion in Virginia as they can in other states; instead, they are forced to play a waiting game that could take years." Id. The Fourth Circuit in Yamaha held that Pike "balancing is therefore appropriate in cases like this one, where interstate commerce is

41

burdened by a state law that imposes barriers to market entry" and that "[t]he unnecessary and excessive breadth" of the statute "persuades us that the statute's burdens clearly exceed its benefits." Id. at 573.  Finally, the court determined that the statute's benefits could have been achieved by a less restrictive alternative, including "some rational geographic limit on protest rights ...." Id.

In the face of Maine, Judge Copenhaver's application of Maine in Medigen I, the Supreme Court's analysis in Carbone and the Fourth Circuit's recent pronouncement in Yamaha of the proper analysis in dormant Commerce Clause cases, this court cannot accept Plaintiffs' argument that West Virginia Code § 24A-2-5 is per se invalid and not subject to further inquiry.  Assuming Plaintiffs show that West Virginia Code § 24A-2-5 discriminates against interstate commerce, the inquiry does not end there.  Pursuant to Maine, the burden shifts to Defendants to "demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." Maine, 477 U.S. at 138 (quoting Hughes, 441 U.S. at 336). On the other hand, assuming the statute regulates evenhandedly and has only an incidental effect on interstate commerce, the court must weigh the burden imposed on interstate commerce to determine whether it is clearly excessive in relation to any putative local benefits.

42

In Medigen I, despite acknowledging Buck and Bush and their relevance and finding that West Virginia Code § 24A-2-5 was a direct rather than incidental burden on interstate commerce, the court stated it could not ignore Maine.  Indeed, the court noted that

> [h]aving concluded that the statutory requirement of a certificate of convenience and necessity, although a direct regulation of interstate commerce generally subject to a rule of *per se* invalidity, nonetheless requires further inquiry, the court finds it unnecessary to address plaintiffs' alternative argument that the requirement is *per se* invalid because it is an impermissible form of economic protectionism. Although the incidental effect of serving a legitimate local purpose may be some degree of economic protectionism, the state is entitled, in light of the Supreme Court's approach in *Maine,* to have its statute considered under the strict scrutiny doctrine.

Medigen I, 787 F. Supp. at 600 n.7.

While Plaintiffs rely on Carbone as a "reiteration" of Buck, Carbone merely noted some similarity to the state law in Buck that was unconstitutional.  Moreover, Carbone clearly engaged in the Maine test and did not strike down the discriminatory ordinance without further inquiry.  Finally, in Yamaha the Fourth Circuit made clear that even in cases where a state statute discriminates facially, in its practical effect or in its purpose, the statute will be struck down "unless the state demonstrates 'both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means.'" Yamaha, 401 F.3d at 567 (quoting Maine, 477 U.S. at 138).

43

Based on the above, even if this court were to find that West Virginia Code § 24A-2-5 discriminates against interstate commerce, this court must still engage in the strict scrutiny analysis set forth in <u>Maine</u>.  Because there are disputed material facts as to the issue of whether there are other available nondiscriminatory means that could serve West Virginia's goal of universal service at reasonable rates as evidenced in the court's summary of the experts' opinions, summary judgment at this stage of the litigation is not appropriate.  Likewise, even if the court proceeds under <u>Pike</u>, material facts remain in dispute.

This brings the court to the difficult task of determining under which tier it should proceed in analyzing West Virginia Code § 24A-2-5.  The court must determine whether the statute discriminates facially, in practical effect or in its purpose, thereby implicating the discrimination tier and the restrictive test of <u>Maine</u>, or whether the statute regulates evenhandedly such that its effects on interstate commerce are only incidental, thereby implicating the <u>Pike</u> balancing test.

It is undisputed that the statute is neutral on its face.  The language of West Virginia Code § 24A-2-5 "makes no distinction between in-state and out-of-state" trash haulers.  <u>Yamaha</u>, 401 F.3d at 568.  Nor is there evidence that the statute has a discriminatory purpose.  West Virginia Code § 24A-1-1 sets forth the legislature's purpose and policy in enacting chapter 24A:

It is hereby declared to be the purpose and policy of the Legislature in enacting this chapter to confer upon the public service commission of West Virginia, in addition to all other powers conferred and duties imposed upon it by law, the power, authority and duty to supervise and regulate the transportation of persons and property for hire by motor vehicles upon or over the pubic highways of this state so as to ... [p]rotect the safety and welfare of the traveling and shipping public in their use of transportation agencies by motor vehicle; ... preserve, foster and regulate transportation and permit the coordination of transportation facilities; ... [and] provide the traveling and shipping public transportation agencies rendering stabilized service at just and reasonable rates.

W. Va. Code § 24A-1-1 (2004). Nothing in chapter 24A's purpose suggests an intent to discriminate against interstate commerce.

The more difficult question this court must answer is whether the statute discriminates in effect or whether it regulates evenhandedly with only an incidental effect on interstate commerce. The court finds that the statute falls in the latter category, and, as a result, is subject to review under <u>Pike</u>.

In determining the "discernable practical effect ... upon interstate commerce," <u>Yamaha</u>, 401 F.3d at 569 (quoting <u>Waste Mgmt. Holdings, Inc. v. Gilmore</u>, 252 F.3d 316, 335 (4th Cir. 2001)), one very significant and compelling fact stands out in this case. BFI and Waste Management, two out-of-state haulers, either obtained the certification required by West Virginia Code § 24A-2-5 by application or through acquisition of smaller companies. Clearly, West Virginia Code § 24A-2-5 "visits its effects "equally upon both interstate and local business," <u>Lewis</u>, 447 U.S. at 36, and, as

such, does not discriminate in effect.  See A.G.G. Enterprises, Inc. v. Washington County, Oregon, 145 F. Supp.2d 1215, 1225 (D. Or. 2001) (finding that ordinance establishing waste hauling franchise burdened interstate commerce only indirectly where "[a]lthough no one is getting a new territory and territories have not been reassigned except through sale by the original hauler, both in-state and out-of-state haulers can compete for the purchase of an existing franchise" and, in fact, "a national corporation owns several of the certificates").

It is true, that the Court in Carbone found the flow control ordinance at issue in that case to be "no less discriminatory because in-state or in-town processors are also covered by the prohibition." Carbone, 511 U.S. at 391.  The facts of Carbone differ significantly from the instant matter.  In Carbone, the flow control ordinance bestowed favored status on Clarkstown's local, privately owned transfer station.  Id.  It hoarded "solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." Id. at 393.  In the instant matter, while there is some incidental effect on interstate commerce, the statute's object is not "local economic protectionism ... that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." Id. at 390.

Furthermore, the court is mindful of Medigen I and Judge Copenhaver's determination that as applied to medical waste

transporters, West Virginia Code § 24A-2-5 was a direct rather than an incidental burden on interstate commerce. Unfortunately, there is little explanation in Medigen I as to why the court concluded that the statute discriminated. The court can only assume, given the absence of any facially discriminatory language in the statute, that the court found discrimination in effect. On appeal, the PSC challenged the District Court's consideration of the statute under the strict scrutiny standard of Maine. See Brief on Behalf of Appellants, PSC, et al., Public Service Comm'n v. Medigen of Kentucky, Inc., No. 92-1245, 1992 WL 12126232, at * 23-28 (4th Cir. May 11, 1992). In its decision, the Fourth Circuit found it unnecessary to address this issue since the statute was unconstitutional even under the more deferential Pike test. Medigen-Fourth Circuit, 985 F.2d at 166.

The finding in Medigen I, that the statute directly rather than incidentally burdened interstate commerce, was one based on the application of the statute to medical waste transporters, not solid waste haulers. Given the facts outlined above and unique to the instant matter dealing with the application of the statute to solid waste haulers, the court must conclude that West Virginia Code § 24A-2-5 as applied to solid waste haulers, does not discriminate in effect.

Instead, the statute's effects on interstate commerce are incidental. While the statute may not discriminate on its face or

in effect, an incidental effect of West Virginia Code § 24A-2-5 is the protection of existing certificate holders, which are both in- and out-of-state haulers.  As the court in <u>Medigen-Fourth Circuit</u> observed, "[b]ecause market entry is only permitted if the Commission determines that the market is not adequately being served, the certification requirement necessarily limits competition, thereby implicating the dormant commerce clause." <u>Medigen-Fourth Circuit</u>, 985 F.2d at 166.  As in <u>Yamaha</u>, <u>Pike</u> "balancing is therefore appropriate in cases like this one, where interstate commerce is burdened by a state law that imposes barriers to market entry." <u>Yamaha</u>, 401 F.3d at 572-73.

Having determined that the <u>Pike</u> balancing test should be applied in the instant matter, the court finds, as evidenced by the expert opinions summarized above, that there are disputed material facts as to whether the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits.  As such, Plaintiffs' Renewed Motion for Summary Judgment must be denied.

I. <u>Res Judicata</u>

As to BFI's assertion that certain aspects of the Commission's October 21, 2002, decision must be given preclusive effect, particularly the factual determinations made by the PSC, the court is not persuaded.

In <u>University of Tennessee v. Elliott</u>, 478 U.S. 788, 799 (1986), the Supreme Court held that

> when a state agency "acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.

(citation omitted).

In West Virginia, <u>res judicata</u> "'generally applies when there is a final judgment on the merits which precludes the parties or their privies from relitigating the issues that were decided or the issues that could have been decided in the earlier action.'" <u>Rowe Grapevine Corp.</u>, 527 S.E.2d 814, 820 (W. Va. 1999) (quoting <u>State v. Miller</u>, 459 S.E.2d 114, 120 (W. Va. 1995)). In addition, <u>res judicata</u> applies to quasi-judicial determinations of administrative agencies, where there is no statutory authority directing otherwise, the prior decision was rendered pursuant to the agency's adjudicatory authority and the procedures employed by the agency are substantially similar to those used in a court. <u>Vest v. Board of Educ.</u>, 455 S.E.2d 781, 785 (W. Va. 1995) (citing <u>Liller v. West Virginia Human Rights Comm'n</u>, 376 S.E.2d 639, 646 (1988)).

BFI's argument is a bit belated, since the court has already permitted discovery and the parties have made expert disclosures. Indeed, it was Defendants and the Intervening Defendants who encouraged the court to permit additional discovery in this matter upon remand from the Fourth Circuit, and stated in the Report of

Parties' Further Planning Meeting that they "feel strongly that the record before the Public Service Commission was made in April, 2001 and that it should be supplemented at this time." (# 73, pp. 1-2.) In addition, SWH stated in its response to Plaintiffs' Motion that it and others were not parties to the PSC proceeding at the evidentiary stage (# 125, pp. 2-3), though they later intervened in the PSC proceeding.

Moreover, while BFI and Plaintiffs may have been adverse in the proceedings before the PSC, the PSC and Plaintiffs were not. The PSC was not a party in the underlying proceeding. Instead, the PSC *adjudicated* the underlying proceedings and in that capacity made the findings of fact that BFI now believes are entitled to preclusive effect. Thus, res judicata cannot operate to give the PSC's factual findings preclusive effect before this court. See Matson Navigation Co., Inc. v. Hawaii Public Utilities Comm., 742 F. Supp. 1468, 1479 (D. Haw. 1990) (finding res judicata did not apply where public utilities commission and the plaintiff company were not adversaries in the prior litigation before the commission).

Based on the above, BFI's res judicata argument must fail. Certainly, the factual findings of the PSC in the underlying proceedings are relevant and will be considered by the court. However, for the reasons discussed above, the PSC's factual findings are not entitled to preclusive effect.

Accordingly, it is hereby **ORDERED** that Plaintiffs' Renewed Motion for Summary Judgment is **DENIED**.

The Clerk is requested to mail a copy of this Memorandum Opinion and Order to all counsel of record and post this published opinion at http://www.wvsd.uscourts.gov.

ENTER: February 24, 2006

Mary E. Stanley
United States Magistrate Judge